E-FILED
Wednesday, 21 April, 2021  09:56:08 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SUPPRESSED, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. _____ |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| SUPPRESSED, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | **PURSUANT TO 31 U.S.C.** |
| | ) | **§ 3730(b)(2)** |
| | ) | |

**DOCUMENT TO BE KEPT UNDER SEAL**

Michael Kanovitz
Scott Rauscher
Julia Rickert *Application for
admission to the Central District of
Illinois forthcoming
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902 *Attorneys for
[under seal]*

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, the STATE OF ILLINOIS, and the STATE OF CALIFORNIA, ex rel. LEAH SHEFFER, | ) ) ) ) | Filed Under Seal and In Camera |
| Plaintiffs, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| VIBRA HEALTHCARE, LLC, AND VIBRA HOSPITAL OF SPRINGFIELD, LLC, | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs, the United States of America, the State of Illinois, and the State of California, through Relator Leah Sheffer ("Sheffer" or "Relator"), complains against Vibra Healthcare, LLC, and Vibra Hospital of Springfield, LLC (together, "Vibra" or "Vibra Healthcare"), for submitting false claims for payment to the Centers for Medicare and Medicaid Services and to private health insurers as follows:

## STATEMENT OF THE CASE

1. Vibra Healthcare runs long-term acute care hospitals and medical rehabilitation facilities across the country. Such facilities are supposed to provide patients with reliable care after they are discharged from traditional hospitals. A long-term acute care hospital (LTCH) provides the same services as a traditional acute care hospital but is designed to accommodate patients who are anticipated to need 25 days or more of inpatient care.

2. The majority of Vibra's patients are covered by government healthcare programs, including Medicare, from which Vibra collects tens of millions of dollars each year. Other Vibra patients are covered by private health insurance.

1

3.      As described below, Vibra has routinely defrauded both Medicare and private health insurance companies by charging inpatients for drugs that Vibra never administered to the patients in question. Vibra then submitted these false charges to Medicare and to private insurers.

4.      Vibra created these false drug charges by, for example, charging patients for a full asthma inhaler each time the patient received a single dose, meaning Vibra would charge for up to 60 inhalers when it has purchased and provided a patient with just a single inhaler. Vibra also charged for name-brand drugs while actually administering far cheaper generic drugs. From January to April 2018 alone, Vibra-Springfield had overcharged patients and their insurers, including Medicare, more than $800,000 for drugs.

5.      By knowingly submitting false drug charges to Medicare, Vibra defrauded the federal government in violation of the False Claims Act. Although Medicare typically reimburses hospitals for the cost of inpatient stays, including drug costs, with a set payment based on the patient's diagnosis (rather than with a payment based on the actual cost incurred by the hospital for the patient's care), false drug charges can still be used to defraud Medicare because they can trigger additional payments—known as "outlier" payments—that are available for unusually expensive inpatient care. Vibra receives millions of dollars in outlier payments every year, and Vibra's false drug charges can illegitimately push the cost of an individual patient's care above the threshold for receiving an outlier payment.

6.      Additionally, by knowingly submitting false drug charges to private insurers in Illinois and California, Vibra violated the Illinois Insurance Fraud Prevention Act and the California Insurance Frauds Prevention Act. These laws each contain a *qui tam* provision that allows whistleblowers to bring suit on behalf of the State for fraud against private insurers.

7.      On information and belief, Vibra's false drug charges to Medicare and private insurers were also reflected in the cost reports Vibra was required to submit to Medicare annually for each of its hospitals. By including these false costs in the cost reports, Vibra could manipulate the "cost-to-charge" ratios that Medicare assigned to its hospitals. A hospital's cost-to-charge ratio compares the hospital's total costs for providing care to all patients in a given year—both Medicare and non-Medicare—to the total amount the hospital billed for that care. Medicare uses a hospital's cost-to-charge ratio in a formula for determining whether and how large an outlier payment is warranted for an individual patient.

8.      By including never-incurred drug costs in its annual cost reports to Medicare, Vibra made the amount of its hospitals' costs look closer to the amount of the hospitals' charges than they actually were, thereby fraudulently manipulating the cost-to-charge ratios in a way that made outlier payments more readily obtainable.

9.      Relator Leah Sheffer is a licensed pharmacist. Beginning in May 2017, she worked in various positions at Vibra Hospital of Springfield, LLC ("Vibra-Springfield"), a now-shuttered LTCH in Illinois, including as the Director of Pharmacy. Through her work, she learned of Vibra's false drug charges and learned that the false charges were rampant throughout the Vibra system. When she told Vibra to stop overcharging, they fired her instead.

10.      This is an action to recover damages and civil penalties on behalf of the United States of America, the State of Illinois, and the State of California, arising from false statements and claims made or caused to be made by Vibra Healthcare in violation of the False Claims Act ("FCA"), as amended, 31 U.S.C. § 3729 *et seq*., the Illinois Insurance Fraud Prevention Act, 740 ILCS 92/1 *et seq.*, and the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871 *et seq.*, as well as for Vibra Healthcare's illegal retaliation against Sheffer.

3

11.     As a former Vibra Healthcare employee, Sheffer is an original source of the allegations in this Complaint, and she has personal knowledge that Vibra routinely charged for medications that were not provided to patients and that Vibra Healthcare took steps to conceal this behavior.

## PARTIES

12.     Plaintiff-Relator Leah Sheffer ("Relator" or "Sheffer") is a Tennessee resident and a licensed pharmacist who worked at Vibra Healthcare for more than a year. She was responsible for overseeing the pharmacy's inventory and for ensuring that records were being properly maintained, among other duties. She was regularly in contact with her counterparts at other Vibra facilities.

13.     Defendant Vibra Healthcare, LLC, is a corporation with its headquarters in Mechanicsburg, Pennsylvania. Defendant Vibra Hospital of Springfield was an LTCH in Illinois that closed in March of 2019.

## JURISDICTION

14.     The Court has jurisdiction over this matter pursuant to 31 U.S.C §§ 3730(b)(1) and 3732 of the FCA, under 28 U.S.C. § 1331 as a federal question and controversy arising under federal law, and under 28 U.S.C. § 1345 as an action commenced by the United States.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391 (b) and (c) and 31 U.S.C § 3732 because Defendant Vibra Healthcare operated Defendant Vibra Hospital of Springfield in this District.

16.     This lawsuit is not based on any publicly disclosed information, and Sheffer is the original sources of information within the meaning of 31 U.S.C. § 3730(e)(4). She has direct and independent knowledge of the fraud through her work for Vibra Healthcare. She voluntarily

4

disclosed the information on which the allegations herein are based to the government before filing this action.

## VIBRA'S MEDICARE FRAUD

### Background

17.    The United States, acting through the Department of Health and Human Services, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*. (Medicare). Medicare is a federally funded health insurance program that benefits primarily the elderly. Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted, and it is administered by the Centers for Medicare & Medicaid Services (CMS).

18.    At all times relevant to this Complaint, Vibra Healthcare provided services to patients insured by Medicare and sought reimbursement for those services. The vast majority of Vibra's Medicare reimbursement claims were for inpatient care. Medicare reimburses LTCHs for inpatient care through the Prospective Payment System (PPS) specific to LTCHs.

19.    To be reimbursed for covered patient care, healthcare providers, including Vibra Healthcare, must submit a Medicare claim either electronically or on CMS Form 1450. By submitting a claim, the provider certifies that "the billing information as shown on the face hereof is true, accurate and complete" and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." Ex. A at 2, Form 1450, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-1450 (last visited 4/12/21).

5

20.     Hospitals that wish to participate in the Medicare program must also submit an annual cost report to CMS. 42 C.F.R. § 413.20(b). These reports include cost data on both Medicare and non-Medicare patients.

21.     Cost reports also include the following certification:

> [T]o the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

22.     Ordinarily, Medicare, through the PPS system, reimburses hospitals, including LTCHs, a fixed amount for inpatient care based on the patient's Diagnosis Related Group (DRG), plus certain standard reimbursements.

23.     Medicare has established DRGs to approximate the reasonable cost of inpatient care for treating particular conditions. This approach discourages hospitals from making unnecessary expenditures because it unties the Medicare reimbursement amount from what a hospital opts to spend on a particular patient's care. The DRG-based payment amount is designed to include reimbursement for inpatient drug costs, which Medicare covers when they "represent a cost to the hospital," are "ordinarily furnished by the hospital . . . for the care and treatment of inpatients," and were in fact "furnished to an inpatient for use in the hospital." 42 C.F.R. § 409.13.

24.     In certain cases, Medicare will reimburse hospitals at an amount greater than the DRG by applying a formula that involves the hospital's actual cost for providing that specific patient's care. These "outlier payments" are available only when the cost of the patient's care

was substantially greater than the set payment for the applicable DRG. When an outlier payment is made, each covered hospital charge is reimbursed on a percentage basis.

25.    The formula for determining the availability and amount of an outlier payment takes the total covered charges from the hospital's Medicare claim and converts these charges to an approximation of the provider's actual costs by applying a hospital-specific "cost-to-charge" ratio (CCR); then subtracting the DRG amount, the standard reimbursement amount, and a "fixed-loss amount" that CMS sets annually (also known as the "outlier threshold"); then discounting any remaining amount by 20%. Whatever is left is the outlier payment, which is paid in addition to the DRG-plus-standard-reimbursement amount. 42 C.F.R. § 412.525(a)(3); see 42 C.F.R. § 412.523(e) (applying § 412.525 to LTCHs).

26.    Put another way, the formula looks like this: Outlier Payment = 0.8 * [(Total covered charges for patient x CCR) – (DRG payment + standard reimbursements + fixed-loss amount)].

27.    To give a hypothetical illustration using realistic numbers, if the total covered charges for an unusually expensive patient's care were $400,000; the hospital's CCR was .45; the applicable DRG with standard reimbursements was $100,000; and the outlier threshold was $25,000, then the outlier payment for the patient's care would be $44,000. The total payment from Medicare to the hospital for that patient would be $144,000, which is the DRG/standard-reimbursement amount plus the outlier payment.

28.    A hospital's CCR is based on data in the annual cost report that institutional healthcare providers must submit to CMS as a condition of participation in the Medicare program. The CCR for a given year is generally based on the provider's most recent tentatively settled cost report (though there are exceptions).

29.     Cost reports include data on a hospital's costs and charges for the care of patients who are covered by Medicare as well as for the care of patients not covered by Medicare. The "charges" in a cost report are the amounts that are normally billed for the services rendered and do not reflect discounts that a hospital may later apply. The purpose of collecting this data is to determine the hospital's markup.

30.     To calculate the CCR for a given year, CMS divides the hospital's total qualifying costs by total qualifying charges for all patients, regardless of whether they are covered by Medicare. The costs and charges for drugs provided on an inpatient basis are included in these amounts.

31.     The resulting ratio can then be used to estimate a hospital's actual costs for a particular patient's care by multiplying the ratio with the charges included in the specific claim submitted to Medicare for that patient. This calculation is the first step in the formula for determining whether an outlier payment is warranted.

32.     The reporting of false costs to Medicare can result in unwarranted outlier payments in two ways.

33.     First, if false costs for treating a particular patient are reflected in an individual Medicare reimbursement claim, the addition can trigger or increase an unwarranted outlier payment. Consider the hypothetical example above in paragraph 27. If the $400,000 in covered charges included $100,000 in charges based on costs that the hospital never actually incurred, the outlier payment would be $36,000 higher than it should be. In other words, the outlier payment of $44,000 should actually be only $8,000 under that scenario.

34.     Second, if false costs—meaning costs not incurred—are included in a hospital's annual cost report to Medicare, those additions would manipulate the hospital's cost-to-charge

ratio in a way that could increase the number and size of outlier payments. The "cost" side of the ratio becomes artificially inflated, resulting in a higher ratio. A higher ratio means, in turn, that charges submitted to Medicare will be discounted to a lesser degree when the CCR is applied as part of the outlier formula.

35.    Using the illustration from paragraph 27 once more, but increasing the CCR from .45 to .5, the outlier payment becomes $60,000, rather than $44,000. Conversely, if the cost-to-charge ratio in that example was to be reduced below .313, no outlier payment would be made at all.

36.    If a hospital includes false costs in its annual cost report to impact the CCR, every subsequent Medicare claim from the hospital for an outlier payment would be a false claim, regardless of whether the specific claim in question itself reflects false charges. Each claim for an outlier payment is false under these circumstances because the amount of reimbursement for each claim is calculated based on a false CCR that makes outlier payments larger and easier to obtain.

**Vibra's False Claims to Medicare**

37.    Vibra Healthcare has knowingly and routinely reported false drug costs to Medicare by 1) submitting individual Medicare claims that reflect costs for drugs Vibra never purchased or administered and 2) including costs for drugs never purchased or administered to patients (both Medicare and non-Medicare) in its annual cost reports.

38.    Vibra's false cost reporting to Medicare has resulted in substantial and lucrative outlier payments that exceed the outlier payments obtained by most institutional healthcare providers. For example, in fiscal year 2018 alone, Vibra-Springfield's Medicare outlier payments made up about 12% of all revenue that the hospital received from Medicare, or nearly

9

$1,000,000 in outlier payments. This percentage puts Vibra-Springfield firmly in the category of "high-outlier" hospitals, which the Inspector General of HHS defined in a 2013 analysis of standard acute care hospitals as those hospitals receiving over 8% of Medicare revenue through outlier payments. *See* Department of Health and Human Services, Office of Inspector General, "Medicare Hospital Outlier Payments Warrant Increased Scrutiny" at 1, 7 (Nov. 2013), available at https://oig.hhs.gov/oei/reports/oei-06-10-00520.pdf (last visited 4/12/21). In the same report, the Inspector General recommended increased scrutiny of outlier payments. *Id.*

39.    Vibra's false inflation of its drug costs is achieved primarily in two ways. The first is by charging patients and their insurers, including Medicare, for a full container of certain medicines when only a single dose has actually been administered ("bulk medication fraud"). The second is by charging for name-brand drugs while actually purchasing and providing patients with cheaper generic version of the medications ("name-brand drug fraud").

40.    An egregious and common example from the category of bulk medication fraud is Vibra's billing for inhalers containing the asthma medication Dulera. Each inhaler contains approximately 120 "puffs" and should last around 30 days (a dose of two puffs in the morning and a dose of two puffs in the evening). Vibra nursing staff normally administered each patient's daily doses from that patient's single inhaler until it was gone. Yet Vibra billed patients' insurers, including Medicare, for a full inhaler for *each dose* administered, resulting in astronomically inflated inhaler costs that were billed to Medicare and, on information and belief, were later included in Medicare cost reports.

41.    The following are examples of Vibra's bulk medication fraud at Vibra-Springfield against Medicare from January to April of 2018:

- Patient M.E. [Patient 18] received Dulera between February 28 and March 27, 2018. Over the course of those 28 days, the patient was administered 106

puffs, which would comprise only 88% of a single Dulera inhaler at a cost of $632.28. The patient went through five inhalers because staff misplaced some, but Vibra-Springfield charged Medicare for 53 Dulera inhalers—nearly two per day—resulting in an overcharge that exceeded $100,000 for this patient. Overcharges for other medications this patient received during the same stay bring the total overcharge amount for this patient's drugs to more than $113,000.

- Patient B.R. [Patient 55] was charged $46,533.60 for 23 inhalers of Dulera. But the patient had been administered just 46 puffs, which would comprise only 38% of a single Dulera inhaler at a cost of $632.28. Instead, Vibra-Springfield overcharged Medicare by more than $45,000 by charging for inhalers that were not supplied to the patient and by charging Medicare more than three times the list-price for each inhaler purportedly supplied.

- Patient A.T. [Patient 73] was charged $4,197.20 for a single dose of Ciprodex ear drops. The usual dose is four drops from a single bottle in the affected ear daily, and each bottle costs around $262, meaning Patient A.T. was overcharged more than $3,900. This patient was also overcharged for other medications, for a total overcharge of more than $19,000.

42.     In the category of name-brand drug fraud, Vibra-Springfield charged insurers, including Medicare, for a slew of different name-brand drugs while actually purchasing and administering a cheaper generic equivalent.

43.     Examples of such charges to Medicare from 2018 include:

- Patient M.G. [Patient 23] received 23 doses of the generic drug lamotrigine, a medication for bipolar disorder, while at Vibra-Springfield. The charge for each dose should have been $16.64. Instead, Vibra Springfield charged Medicare $357 for each dose, which is the market cost for Lamictal, the name-brand version of the drug. This created an overcharge of more than $7,800.

- Patient K.D. [Patient 17] received 103 infusions of generic meropenem during a month-long stay. The patient should have been charged $51.84 for each infusion, but Vibra instead charged the patient $281.50 per infusion by claiming to have provided name-brand Merrem IV. The resulting overcharge was more than $23,000.

- Patient T.W. [Patient 78] was given 24 doses of Atorvastatin 20mg tablets to treat his cholesterol while being charged for brand name Lipitor. Over the course of those 24 days, this patient was administered one tablet by mouth daily. The charge for Lipitor 20mg

11

tablets is $286.80 per tablet compared to the charge for the generic equivalent, Atorvastatin, of $20 per tablet. Vibra Springfield charged Medicare $6,883.20 for 24 Lipitor tablets but administered 28 atorvastatin tablets to the patient. The price Medicare should have been charged is $480. The evidence of the generic medication being ordered can be seen in records of orders with AmerisourceBergen.

- Patient W.T. [Patient 74] was given 18 doses of Enoxaparin 80mg injections for anticoagulation between March 3 and March 12, 2018, but was charged for brand name Lovenox. The charge for Lovenox 80mg is $317.90 per injection compared to the charge for the generic equivalent, Enoxaparin, of $76.32 per injection. Vibra-Springfield charged Medicare $5,722.20 for 18 Lovenox injections but administered 18 Enoxaparin injections to the patient. The price Medicare should have been charged is $1,373.76. Medicare was billed an additional $241.58 per dose of Enoxaparin.

44.     By charging Medicare for these and other drugs not administered, Vibra sought more and larger outlier payments than it was entitled to receive. On information and belief, Vibra then included these and other false drug costs in its annual Medicare cost reports to manipulate its hospitals' CCRs, so as to make future outlier payments easier to obtain.

45.     By charging Medicare for false drug costs and by including these false drug costs in Medicare cost reports, Vibra acted in contravention of the certifications it made in those claims and cost reports that Vibra was providing CMS with complete and accurate information.

46.     The inclusion of false charges and costs in Medicare reimbursement claims and cost reports caused Medicare to make unwarranted and inflated outlier payments to Vibra.

**VIBRA'S PRIVATE INSURANCE FRAUD**

47.     Vibra also fraudulently billed private health insurance companies for drug costs that were never incurred. The following are examples of false drug costs that were billed to private insurers in Illinois:

- Patient P.P. [Patient 47] was provided with four Dulera inhalers at Vibra-Springfield in March and April of 2018 and should have been charged a total of $2,528 for them. But Vibra instead billed P.P.'s

insurance, Coventry Health Care, over $90,000 for Dulera inhalers. Vibra also overbilled Coventry by an additional $22,000 for other drugs not actually provided to P.P.

- Patient J.S. [Patient 67] received multiple doses of at least seven different generic medications while hospitalized at Vibra-Springfield, but Vibra billed the patient and the patient's insurer, United Healthcare, for the name-brand versions of those drugs. The generic drugs administered include warfarin, dexmedetomidine, vitamins, enoxaparin, meropenem, metoclopramide, and metaxalone. The total overcharge resulting from charging for the name-brand version of these drugs exceeded $27,000.

- Patient J.B. [Patient 8] received 96 doses of atorvastatin, a drug to lower cholesterol, during a stay at Vibra-Springfield in March and April of 2018. But Vibra fraudulently charged the patient and the patient's insurer, Blue Cross Blue Shield, for the name brand version, Lipitor. The same patient also received generic amlodipine, a blood-pressure drug, while at Vibra-Springfield but was charged for the name-brand version. The total overcharge for the drugs this patient received was more than $7,000.

- Patient D.M. [Patient 45] received 25 doses of generic daptomycin but was charged for the name-brand version, Cubicin. The patient also received 36 doses of generic atorvastatin, but Vibra charged the patient and the patient's insurer, Coventry Health Care, for Lipitor, the name-brand version of that drug. The overcharges for this patient totaled more than $22,000.

48.    Vibra's false claims to private insurers in Illinois defrauded those insurers in violation of the Illinois Insurance Fraud Prevention Act.

49.    Upon information and belief, Vibra used the same scheme to improperly bill private insurers in California, in violation of the California Insurance Frauds Prevention Act. Although Relator is unable to provide specific patient examples from California without access to Vibra's internal records, the Vibra computer and billing systems were set up in a way such that the problems identified above were the same nationwide, rather than unique to the Illinois facility where Relator worked. And, as explained in paragraph 53, below, Vibra officials confirmed to Relator that the billing issues were prevalent at all Vibra facilities.

13

50.     Additionally, while claims to private insurers cannot directly result in Medicare payments, Vibra, on information and belief, also included the false drug costs and charges billed to privately insured patients in its annual Medicare cost reports. By doing so, Vibra further manipulated the CCR for each Vibra hospital, making outlier payments from Medicare illegitimately easier for Vibra to obtain in future. Reporting these false costs to Medicare violated Vibra's Medicare certifications and made its claims to Medicare false.

**RELATOR'S KNOWLEDGE OF VIBRA'S FRAUD**

51.     Relator Leah Sheffer learned of Vibra's rampant false drug charges through her work as a pharmacist for Vibra-Springfield.

52.     While working for Vibra, Sheffer began noticing discrepancies between the drugs Vibra was ordering from its supplier and the drugs for which Vibra was billing Vibra-Springfield's patients and their insurers. She repeatedly brought these issues to the attention of her superiors, who acknowledged the problems but did not correct them.

53.     Sheffer also learned from colleagues and contacts at other Vibra facilities that Vibra's practice of reporting false drug charges to Medicare and private insurers was not confined to Vibra-Springfield. In fact, Michele Arledge, the Regional Pharmacy Manager, and Jeff Weier, the CEO of Vibra-Springfield, explicitly told Relator that the billing problems Relator had identified were prevalent at each Vibra location throughout the country and had been since the facilities opened.

**COUNT I**
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

54.     Relator hereby realleges and incorporates by reference the allegations contained in the paragraphs above.

14

55.     Vibra has knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to Medicare.

56.     When Vibra presented or caused to be presented the false or fraudulent claims for payment or approval, it knew that the claims were false or fraudulent or acted in deliberate ignorance or reckless disregard thereof.

## COUNT II
(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729(a)(1)(B))

57.     Relator hereby realleges and incorporates by reference the allegations contained in the paragraphs above.

58.     Vibra knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by Medicare.

59.     When Vibra made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by Medicare, it knew that the information they contained was false or it acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

## COUNT III
(Illinois Insurance Fraud Prevention Act: Knowingly Defrauding a Private Insurer) (740 ILCS 92/15(a))

60.     Relator hereby realleges and incorporates by reference the allegations contained in the paragraphs above.

61.     As detailed above, Vibra knowingly submitted or caused to be submitted false claims for payment to private health insurance companies in Illinois. Specifically, Vibra charged private insurers for drugs that were never administered to the insured patients. Vibra took these

15

actions with the intent to permanently deprive the insurers of their payments for the false drug charges.

62.     By knowingly submitting false charges to private insurers for reimbursement, Vibra committed insurance fraud in violation of 20 ILCS 5/17-10.5(a)(1). Violations of § 17-10.5(a)(1) are actionable by private parties on behalf of the State under the Insurance Fraud Prevention Act, 740 ILCS 92/5(b).

### COUNT IV
**(California Insurance Frauds Prevention Act: Knowingly Defrauding a Private Insurer)**
**(Cal. Ins. Code § 1871.7)**

63.     Relator hereby realleges and incorporates by reference the allegations contained in the paragraphs above.

64.     As detailed above, Vibra knowingly submitted or caused to be submitted false claims for payment to private health insurance companies in California. Specifically, Vibra charged private insurers for drugs that were never administered to the insured patients. Vibra took these actions with the intent to permanently deprive the insurers of their payments for the false drug charges.

65.     By knowingly submitting false charges to private insurers for reimbursement, Vibra committed insurance fraud in violation of the California Penal Code, and in particular Cal. Penal Code § 550. Violations of Cal. Penal Code § 550 are actionable by private parties on behalf of the State under the Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7.

### COUNT V
**(Relief from Retaliatory Actions)**
**(31 U.S. Code § 3730(h) and 740 ILCS 92/40))**

66.     Relator hereby realleges and incorporates by reference the allegations contained in the paragraphs above.

67.    When Relator initially raised concerns about the billing discrepancies she had discovered at Vibra-Springfield, Vibra management feigned concern and purported to want to correct the problems. But Vibra never corrected the problems.

68.    As Relator continued to press the issue of Vibra's false drug billing, her superiors started to retaliate against her. They began by cutting her out of decision-making and by spreading false rumors about her.

69.    Eventually, management retaliated against Relator by placing her on an unwarranted performance improvement plan. The plan limited amount of time Relator was permitted to spend in the pharmacy.

70.    Relator nevertheless continued to speak out about the billing practices at Vibra that she now recognized as fraud. As a result, she was fired in October 2018 and escorted off the hospital's premises.

71.    The retaliation described above violated Federal and Illinois state law protections for whistleblowers.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests that judgment be entered in her favor and against Vibra as follows:

a. in the amount of the maximum statutory penalties for each false claim and false statement that Vibra submitted or caused to be submitted to Medicare or a private insurer, together with treble the amount of payment received and/or costs avoided;

b. awarding Relator the maximum recovery to which she is entitled by statute;

17

c.  awarding the costs and reasonable attorney's fees incurred in prosecuting this

action;

d.  compensating Relator for the retaliation she suffered; and

e.  all such further relief as may be just and proper.

## JURY DEMAND

Relator hereby demands trial by jury.

Respectfully submitted,

Michael Kanovitz
Scott Rauscher
Julia Rickert *Application for
admission to the Central District
of Illinois forthcoming
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902 *Attorneys
for Relator*

18